

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
08/31/2009

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **ADVANCED MODULAR POWER** | § | **Case No. 07-34646-H4-7** |
| **SYSTEMS, INC.,** | § | |
| Debtor. | § | **Chapter 7** |
| | § | |
| **WILLIAM G. WEST, TRUSTEE,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 08-03177** |
| | § | |
| **DAVID HSU, individually and as agent** | § | |
| **for INFORMATION AND** | § | |
| **COMPUTING TECHNOLOGY, INC.,** | § | |
| **and INFORMATION AND** | § | |
| **COMPUTING TECHNOLOGY, INC.,** | § | |
| Defendants. | § | |
| | § | |

**MEMORANDUM OPINION ON THE TRUSTEE'S FIRST AMENDED ORIGINAL COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE, BREACH OF FIDUCIARY DUTY, USURPATION OF CORPORATE OPPORTUNITY, AND ALTER EGO**
[Docket No. 34][1]

## I. INTRODUCTION

In the suit at bar, the Chapter 7 Trustee, William G. West (West or the Plaintiff or the Trustee), brings this adversary proceeding against David Hsu (Hsu), individually and as an agent for Information and Computing Technology, Inc. (ICT), and against ICT (the Defendants, collectively). The Trustee alleges eight separate causes of action: (1) Pursuant to 11 U.S.C. § 541 and § 542: Turnover of property of the estate; (2) Conversion of estate assets; (3) Pursuant to 11 U.S.C. § 549

---

[1] Any reference to a "Docket No." herein is a reference to the docket number in the adversary proceeding number 08-03177. Any reference to a pleading filed on the docket in the main case will be identified with the main case number 07-34646.

and § 550:  Post-petition transfers; (4) Breach of fiduciary duty; (5) Pursuant to 11 U.S.C. § 548: Fraudulent transfer under the Bankruptcy Code; (6) Pursuant to Tex. Bus. & Com. Code Ann. § 24.001, et seq: Fraudulent transfer under state law; (7) Pursuant to 11 U.S.C. § 510(c): Equitable subordination; and (8) Usurpation of business opportunities.

The Trustee requests that this Court order the Defendants to turn over all payments and other assets identified as belonging to the bankruptcy estate and order the Defendants to make a detailed accounting of, and provide access to, all books and records of Hsu's non-debtor entity known as American Mobile Power Services, Inc. (AMP Services).

After considering the arguments, pleadings of the parties, testimony adduced at trial, and the evidence admitted, the Court now makes its written findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.[2]  To the extent that any finding of fact is construed as a conclusion of law, it is adopted as such.  Moreover, to the extent that any conclusion of law is construed as a finding of fact, it is adopted as such.  The Court reserves its right to make additional findings of fact and conclusions of law as it deems appropriate or as may be requested by any of the parties.

## II. FINDINGS OF FACT

1.    The debtor entity, Advanced Modular Power Systems, Inc. (the Debtor or AMPS), was a Texas corporation, formed on April 11, 1996, which manufactured and sold hydraulic generators in the OEM market in the fire industry.[3]

---

[2]Any reference herein to "the Code" refers to the United States Bankruptcy Code.  Further, reference to any section (i.e. §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Reference to a "Rule" or "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

[3] The Trustee made this allegation in his amended complaint, [Docket No. 34, ¶ 9], and the Defendants admitted this allegation in their answer to the amended complaint, [Docket No. 36, ¶ 9].

2.      Hsu owns and controls ICT. [Tape Recording, 7/9/09 Trial at 10:52.] ICT owned 75% of AMPS, and Gary McCann (McCann) owned the remaining 25% interest. [Tape Recording, 7/9/09 Trial at 10:56.] Therefore, the Defendants had access, knowledge, and ability to influence the operations of the Debtor.

3.      Gene Edward Inman (Inman), AMPS's Chief Financial Officer, together with McCann, managed the day-to-day operations of AMPS. [Tape Recording, 7/9/09 Trial at 3:56]; [Pl.'s Ex. 4]; [Tape Recording, 7/9/09 Trial at 10:58].

4.      On February 19, 2002, Merrill Lynch Business Financial Services Inc. (Merrill Lynch), a creditor in the main bankruptcy case, provided a loan to AMPS of approximately $900,000.00. [Case No. 07-34646, Docket No. 1, Schedule D - Creditors Holding Secured Claims.]

5.      By late 2006, AMPS's generator sales had substantially declined. [Tape Recording, 7/9/09 Trial at 11:01, 3:57.] This decline in sales caused or contributed to conflicts among the owners, directors, and managers of AMPS, including, but not limited to, disagreements between Hsu, on the one hand, and McCann and Inman, on the other. [Tape Recording, 7/9/09 Trial at 11:01.]

6.      By the time AMPS filed its bankruptcy petition, AMPS's service business was the only viable division of AMPS because the decline in generator sales eliminated the sales aspect of AMPS's business. [Tape Recording, Trial 7/9/09 at 11:01, 3:58.]

7.      In January 2007, Hsu, as an officer and director of AMPS and ICT, terminated Inman and McCann and began managing AMPS's operations himself. [Tape Recording, 7/9/09 Trial at 10:58, 3:56.]

8.      On February 20, 2007, Hsu incorporated a new business by the name of: AMP Services.[4]

[Pl.'s Ex. 7.]   The incorporation papers filed with the Texas Secretary of State list Junying

Lu (Lu) as a Registered Agent/Officer.  [Pl.'s Ex. 7.]   On November 24, 2008, Lu resigned

as a registered agent.   [Pl.'s Ex. 8.]   At some point, Hsu offered an ownership interest in

AMP Services to Lu, but Lu did not accept any stock in AMP Services.   [Tape Recording,

7/9/09 Trial at 11:06.]   Therefore, Hsu is the sole shareholder of AMP Services.   [Tape

Recording, 7/9/09 Trial at 11:05.]   The 2008 tax return for AMP Services falsely listed

David Rose and Lu as the owners of AMP Services.   [Tape Recording, 7/9/09 Trial at 11:08];

[Pl.'s Ex. 66, p.3].

9.      Shortly after the incorporation of AMP Services, the Defendants assumed and exercised

control over the AMPS's service business and AMPS's related telephone number, name,

acronym, customer information and customer lists, address, vendor information, and

competitive advantages in the forms of goodwill and specialized knowledge (AMPS's

Assets).   [Tape Recording, 7/9/09 Trial at 11:41, 2:35.]   The address set forth in the

Certificate of Formation for AMP Services filed with the Texas Secretary of State is 13013

Jess Pirtle Blvd., Sugar Land, Texas 77478.   [Pl.'s Ex. 7.]   This is the same address as set

forth in the Chapter 7 petition signed by Hsu and filed with this Court on July 10, 2007.

[Pl.'s Ex. 1.]

10.     When the Debtor filed its bankruptcy petition, its operations had essentially ceased.   [Tape

Recording, 7/10/09 Trial at 1:06.]

---

[4] AMP Services, the newly formed non-debtor entity, is not to be confused with the Debtor, AMPS.  AMP Services  is an abbreviation for American Mobile Power Services, Inc. whereas AMPS is the acronym for Advanced Modular Power Systems, Inc.

11.    Once AMP Services was established and after AMPS filed its bankruptcy petition, AMP Services sent a letter to many of AMPS's customers referring to the reorganization of AMPS. [Pl.'s Ex. 2.] The Defendants contacted customers of AMPS to indicate that the formation of AMP Services would provide the same services previously available through AMPS. [Pl.'s Ex. 2.]

12.    On July 10, 2007 (the Petition Date), Hsu, as a director and the President of AMPS, filed a voluntary Chapter 7 bankruptcy petition on AMPS's behalf. [Case No. 07-34646, Docket No. 1.]

13.    On July 25, 2007, AMP Services issued an invoice to a customer of AMPS for generator services. [Pl's Ex. No. 3.]

14.    After July 10, 2007, neither this Court nor the Trustee authorized any transfers of property out of the Debtor's bankruptcy estate.

15.    On the Petition Date, the United States Trustee, pursuant to 11 U.S.C. § 701, appointed West as the interim Trustee for the case. On August 15, 2007, at the meeting of creditors, West became the permanent Trustee for the case under 11 U.S.C. § 702.

16.    On the Petition Date, the Debtor had over $1,500,000.00 in debts, including a secured loan from Merrill Lynch with a balance owing of approximately $900,000.00. [Case No. 07-34646, Docket No. 1, Summary of Schedules]; [Tape Recording, 7/10/09 Trial at 1:09].

17.    On the Petition Date, the Debtor had tangible assets with little or no value. [Tape Recording, 7/10/09 Trial at 1:09.]

18.    From September 2007 to January 2008, AMP Services received checks totaling $30,717.91, which were made payable to AMPS for services rendered post-petition. [Pl.'s Ex. 14-22.]

Invoice dates ranged from July 25, 2007 to December 21, 2007. [Pl.'s Ex. 14-22.] AMP Services fulfilled orders from customers of AMPS, and AMP Services also purchased equipment needed for the continued operation of AMP Services. [Pl.'s Ex. 25, 27-47.] These post-petition transactions began on July 25, 2007 and continued until January 2008. [Pl.'s Ex. 14-25, 27-47.] For example, on July 25, 2007, AMP Services issued an invoice to a customer of AMPS for generator services. [Pl.'s Ex. No. 3.]

19.    In February of 2008, Hsu, individually, and as agent of ICT, hired a cleaning crew to remove AMPS's records that remained in the leased space once used for its business, and this cleaning crew thereafter disposed of twenty to thirty boxes of AMPS's documents that were in the building. [Tape Recording, 7/9/09 Trial at 9:14.]

20.    On May 28, 2008, the Trustee, on behalf of the Debtor's estate, filed a "Complaint for Turnover of Property of the Estate, Breach of Fiduciary Duty, Usurpation of Corporate Opportunity, and Alter Ego" (the Complaint) initiating this adversary proceeding to recover certain property, or its equivalent value, belonging to the estate. [Docket No. 1.]

21.    On May 29, 2008, this Court issued a Comprehensive Scheduling, Pretrial, and Trial Order. On October 14, 2008, this Court signed an Agreed Order on Joint Motion to Enter into a New Scheduling Order (the Scheduling Order) setting April 23, 2009 as the deadline for discovery. [Docket No. 14.]

22.    On March 13, 2009, AMP Services filed Form 1120 U.S. Corporation Income Tax Return with the Internal Revenue Service for the fiscal year ending December 31, 2007. [Pl.'s Ex. No. 66, p.7.] In this tax return, AMP Services reported gross profits of $134,056.00 and the following expense deductions: Salary & Wages, $32,803.00; Repairs & Maintenance,

6

$338.00; Rent, $6,700.00; Taxes & Licenses, $9,232.00; and other miscellaneous expenses of $33,554.00. [Pl.'s Ex. No. 66, p.7.] There were no accompanying schedules to support the miscellaneous expenses. [Pl.'s Ex. No. 66.]

23. On March 13, 2009, AMP Services filed Form 1120 U.S. Corporation Income Tax Return with the Internal Revenue Service for the fiscal year ending December 31, 2008. [Pl.'s Ex. No. 66, p.1.] In this tax return, AMP Services reported gross profits of $214,943.00 and the following expense deductions: Salary & Wages, $30,249.00; Repairs & Maintenance, $1,130.00; Rent, $13,316.00; Taxes and Licenses, $22,612.00; Interest, $142.00; Depreciation, $72.00; and other miscellaneous expenses, $62,960.00. [Pl.'s Ex. No. 66, p.1.] Once again, there were no accompanying schedules to support the miscellaneous expenses. [Pl.'s Ex. No. 66.]

24. In the Complaint, West requested that the Defendants turn over all payments and other assets identified as belonging to the Debtor's estate and provide the Trustee with access to all books and records of AMP Services, which necessarily includes the 2007 and 2008 tax returns of AMP Services. [Docket No. 1.] Moreover, West, in a document production request, requested that the Defendants produce any tax returns of AMP Services. Despite the fact that the tax returns had been filed in March of 2009, Hsu failed to turn over these tax returns by April 23, 2009, the discovery deadline in the Scheduling Order. Rather, Hsu produced these documents on or about June 13, 2009, only two weeks before the scheduled trial. [Tape Recording, 7/10/09 Trial at 1:26.]

25. On June 3, 2009, the Trustee filed a "Motion to Compel Production, and for Sanctions Based Upon Spoliation of Evidence and Causing Estate to Incur Unnecessary Expenses by

Requiring a Mandarin Interpreter at His Deposition" against Hsu for failing, among other things, to produce documents and destroying financial documents relating to AMPS. [Docket No. 21.]

26.  Hsu testified that he inspected the twenty to thirty boxes of documents located at his residence, but did not inspect the twenty to thirty boxes left at the Debtor's office before he authorized those documents to be destroyed. [Tape Recording, 7/9/09 Trial at 9:29.] Hsu testified that he had a "rough idea" of what each destroyed box contained. [Tape Recording, 7/9/09 Trial at 9:35.]

27.  Hsu was aware that West had been to the building looking for documents relating to AMPS's business records. [Tape Recording, 7/9/09 Trial at 9:06.] Hsu knew that not all of the information on the hard drive was accurate. [Tape Recording, 7/9/09 Trial at 9:23.] West testified that the only way to verify or correct the incomplete financial records of AMPS is through obtaining the actual documents in the boxes. [Tape Recording, 7/9/09 Trial at 10:19.]

28.  Regarding the destruction of documents belonging to AMPS, Hsu testified that "we were told to abandon everything by Mr. West." [Tape Recording, 7/9/09 Trial at 9:33.] West testified that he (i.e. West) gave no authorization for the destruction or other disposition of documents. [Tape Recording, 7/9/09 Trial at 10:18.]

29.  West testified that, through the inability of Hsu to produce documents, West has been unable to ascertain the true financial situation of the Debtor as of the Petition Date, particularly the services portion of the Debtor's business. [Tape Recording, 7/9/09 Trial at 10:19.]

8

30.   At Hsu's deposition, he testified that the documents left at the Debtor's office which the cleaning crew threw out were AMPS's financial documents.[5] [Tape Recording, 7/9/09 Trial at 9:45.] However, at trial, Hsu testified that the destroyed documents had no relevance to the bankruptcy case. [Tape Recording, 7/9/09 Trial at 9:13.] Hsu also testified that one of the reasons he had the cleaning crew destroy the documents was because there was no place to keep the documents. [Tape Recording, 7/9/09 Trial at 9:18.]

31.   West used solely AMP Services's 2007 and 2008 tax returns to compute the damages he seeks in this suit. [Tape Recording, 7/10/2009 Trial at 1:22.] West, who is an accountant by trade, testified why he seeks gross profits as a measure of damages: In his view, if an existing company wanted to purchase the Debtor's business (which, according to West, would essentially be purchasing an income stream), that purchaser would be asked to pay gross sales less costs of goods sold (i.e. gross profits) rather than net income because the purchaser, as an existing company, would already have its own office, overhead, and infrastructure in place.  [Tape Recording, 7/10/2009 Trial at 1:37.]

32.   On July 2, 2009, the Trustee filed the "Trustee's First Amended Original Complaint for Turnover of Property of the Estate, Breach of Fiduciary Duty, Usurpation of Corporate Opportunity, and Alter Ego" (the Amended Complaint).  [Docket No. 34.]  On this same date, the Court held a pre-trial conference in this suit.

33.   On July 8, 2009, the Defendants filed their Answer to the Amended Complaint. [Docket No. 36.]

---

[5] The twenty to thirty boxes of documents left at the office are not to be confused with the twenty to thirty boxes of documents located at Hsu's residence.  They are separate and distinct.

34. On July 9 and 10, 2009, this Court held a trial in this suit, at which time evidence was presented, arguments were made, and testimony was adduced from four witnesses.

35. On July 15, 2009, counsel made closing arguments, and this Court took the matter under advisement.

### III. CREDIBILITY OF WITNESSES

At the trial held on July 9 and 10, 2009, this Court heard testimony from the following witnesses: (A) West, the Plaintiff and Chapter 7 Trustee; (B) Hsu, one of the Defendants and the agent of the other Defendant, ICT; (C) Junying Lu (Lu), an employee of ICT, AMPS, and AMP Services; and (D) Inman, AMPS's former Chief Financial Officer. The Court's assessment of the credibility of each witness is set forth below.

**A.    West**

The Court finds West to be very credible on all issues about which he testified. West testified credibly about his trips to the offices of AMPS to retrieve assets and information needed for the administration of the bankruptcy estate and also what occurred during those trips. After the Court overruled the Defendants' objection to West's testimony on damage calculations, West testified credibly about how he calculated the damages he seeks by using AMP Services' 2007 and 2008 tax returns.

**B.    Hsu**

The Court finds Hsu to be credible on only some of the issues on which he testified. For example, Hsu testified credibly on his involvement in AMPS and not being involved in AMPS's day-to-day operations prior to January 2007. [Tape Recording, 7/9/2009 Trial at 9:27.] Hsu also testified credibly on the operation of the Debtor's business, [Tape Recording, 7/9/2009 Trial at 10:54], and

10

the formation of AMP Services, [Tape Recording, 7/9/2009 Trial at 11:03]. The Court does, however, have concerns about Hsu's conflicting testimony about the destruction of twenty to thirty boxes containing records of the Debtor's operations. At his deposition, Hsu testified that he himself disposed of the twenty to thirty boxes left behind in the building where the Debtor had its office and that he brought a separate set of twenty to thirty boxes to his home to inspect and store. [Finding of Fact No. 26.] However, at trial, Hsu testified that a cleaning crew disposed of the twenty to thirty boxes that were left in the Debtor's office. [Finding of Fact No. 30.] Additionally, Hsu failed altogether to answer certain questions during the trial, which causes this Court to question his credibility. Finally, the 2008 tax return for AMP Services, which Hsu completely controls, falsely listed David Rose and Junying Lu as the owners; and this misrepresentation further casts aspersions on Hsu's credibility. Overall, Hsu was much less credible than West.

C.   **Lu**

The Court finds Lu to be credible on the few issues about which she testified. Lu was the only witness who was present during the daily operations of AMPS, and therefore was able to testify credibly about West's trips to AMPS and other day-to-day operations of the Debtor. [Tape Recording, 7/9/2009 Trial at 10:07.] The Court does not have any concerns about Lu's testimony.

D.   **Inman**

The Court finds Inman to be credible on the few key issues about which he testified. Inman testified credibly on AMPS's sources of income and the percentage of sales income versus services income. [Tape Recording, 7/9/2009 Trial at 3:57.] He also testified credibly on the number of employees who worked at AMPS, and whether these employees provided administrative services or labor. [Tape Recording, 7/9/2009 Trial at 4:05.] Overall, the Court finds Inman to be a credible

11

witness.

After hearing all the testimony, this Court gives the most weight to West's testimony.  The Court gives much less weight to Hsu's testimony because of the inconsistencies between his testimony at trial and his testimony at his deposition. Hsu also failed to answer certain questions during the trial, which further causes this Court to question his credibility.  The Court gives equal weight to the testimony of Inman and Lu because this Court believes each witness testified to the best of his and her knowledge, respectively.

### IV. CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue**

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  This particular dispute is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), (H), (O), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *In re Ginther Trusts*, No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that an "Adversary Proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Venue is proper pursuant to 28 U.S.C. § 1409.

**B.    The Defendants' objection to the Plaintiff's testimony on damage calculations using the 2007 and 2008 tax returns of AMP Services is overruled, and this Court will allow the Plaintiff's testimony to be admitted into the record.**

The Court first addresses an issue that arose during trial: whether the Court should have overruled the Defendants' objection to the Plaintiff's testimony on damage calculations.  The Court

concludes that the Defendants' objection to the Plaintiff's testimony on damage calculations should be overruled and that, therefore, the Plaintiff's testimony should be admitted as evidence even though the Plaintiff failed to disclose the damage computation before the trial. Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires "a computation of each category of damages claimed by the disclosing party," and also requires the disclosing party to make available for inspection any documents or other evidentiary material on which the calculations are based. Fed. R. Civ. P. 26(a)(1)(A)(iii). The purpose of this rule is to prevent an ambush, resulting in surprise or prejudice, of undisclosed or late disclosed evidence. *Reed v. Iowa Marine & Repair Corp.*, 16 F.3d 82, 85 (5th Cir. 1994) (finding the basic purpose of Rule 26 is "preventing prejudice and surprise"). Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *CQ Inc. v. TXU Mining Co. LP*, 565 F.3d 268, 279 (5th Cir. 2009).

In deciding whether the Plaintiff's failure to provide information—i.e. the damages computation—is substantially justified or is harmless to the Defendants, this Court considers the following four factors: (1) the explanation for the Plaintiff's failure to disclose; (2) the importance of the evidence; (3) the potential prejudice to the Defendants of including the evidence; and (4) the possibility of curing such prejudice by granting a continuance. *Betzel v. State Farm Lloyds*, 480 F.3d 704, 707 (5th Cir. 2007); *Paradise Towing, Inc. v. CIT Group/Sales Fin., Inc.*, 368 B.R. 569, 573 (W.D. Tex. 2005) (citing *Texas A&M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003)). Bankruptcy courts have broad discretion in such matters and appellate courts

rarely find an abuse of discretion. *Paradise Towing*, 368 B.R. at 573 (citing *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996)).

1.    **Explanation for the Plaintiff's Failure to Disclose**

The Plaintiff's explanation for his failure to disclose substantially justifies the nondisclosure. A failure to disclose evidence is "substantially justified" under Federal Rule of Civil Procedure 37(c) where the disclosing party had no knowledge of the evidence until after the discovery deadline has passed. *See Silchia v. MCI Telecomms. Corp.*, 942 F. Supp. 1369, 1377 (D. Colo. 1996). The Trustee (i.e. the Plaintiff) did not receive AMP Services' tax return information until two weeks before the July 9, 2009 trial, and therefore had no knowledge as to the information contained in the tax returns. [Finding of Fact No. 24.] According to the Scheduling Order signed by this Court on October 14, 2008, all discovery was to be completed by April 23, 2009. [Finding of Fact No. 21.] Because the Trustee received the tax returns after the discovery deadline, he could not calculate the damages and timely disclose the calculations to the Defendants. Therefore, the disclosure made during trial on how damages were calculated was not late given that the Trustee obtained the 2007 and 2008 AMP Services tax returns two weeks before trial—i.e. approximately eight weeks after the discovery deadline and approximately fourteen weeks after AMP Services had filed these tax returns. Because the Defendants failed to timely produce the tax returns to the Trustee, thus committing discovery abuse, the Plaintiff's nondisclosure of the damage calculation before the trial is substantially justified. Therefore, this factor weighs heavily in favor of admitting the Plaintiff's testimony regarding the damage calculations.

### 2.    Importance of the Plaintiff's Testimony

The Trustee's testimony in this case is necessary to this Court issuing a fair ruling and correct award of damages. "The [C]ourt should award the amount of damages necessary to make the [D]ebtor's estate/creditors whole and any damages awarded should put the estate back in the financial condition in which it would have been" before any wrongdoing by the Defendants. *ASARCO LLC v. Ams. Mining Corp.*, 404 B.R. 150, 173 (S.D. Tex. 2009). In order for this Court to issue such an award, this Court needs the Trustee's testimony on the claimed damages calculations. This necessity makes the Trustee's testimony essential to this suit. Accordingly, this factor gives weight to the argument that the Plaintiff's testimony should be admitted.

### 3.    Prejudice to the Defendants of Including the Evidence

The Defendants will not be prejudiced if this Court admits the Plaintiff's testimony as evidence. The purpose of Federal Rule of Civil Procedure 26 is to prevent an ambush, resulting in surprise or prejudice, of undisclosed, or untimely disclosed, evidence. *Reed*, 16 F.3d at 85. No real prejudice exists to the opposing party in allowing the disclosing party to introduce evidence that has been in the opposing party's possession for several weeks. *See EEOC v. Mazzanti*, No. 2:07CV171-B-A, 2009 WL 927426, at *3 (N.D. Miss. Apr. 2, 2009). The Trustee's damages calculations are based solely on the 2007 and 2008 tax returns for AMP Services provided by the Defendants. [Finding of Fact No. 31.] Hsu has seen all the information contained in these documents, and thus, the documents contain no information that would surprise or ambush Hsu in any way. The tax returns that were used to compute the damages were in Hsu's possession since the tax returns were filed.[6]

---

[6] On May 28, 2008, when the Trustee filed the Complaint, neither the 2007 nor the 2008 AMP Services tax return had been filed. [Finding of Fact No. 24.] Therefore, these documents were not in the Defendants' possession at that time. However, on March 13, 2009, these tax returns were filed, but the Defendants waited until June 13, 2009 to

Therefore, no real prejudice exists in allowing the Trustee's testimony regarding the calculation of damages using the Defendants' tax returns. Thus, this factor also supports the Court admitting the Trustee's testimony.

### 4.      Possibility of Curing such Prejudice by Granting a Continuance

The fourth and final factor is neutral and does not weigh in favor of either party. Because the Court has already concluded that the Defendants will not be prejudiced by the inclusion of the Plaintiff's testimony, any continuance allowed would result in unnecessary, additional delay and increased expenses to all parties. Moreover, the Defendants in this suit did not request that the Court grant a continuance to allow an opportunity to cure any alleged prejudice.

In sum, because three factors weigh in favor of the Plaintiff's testimony being admitted, and one factor is neutral on the issue, this Court concludes that the Plaintiff's testimony regarding damage calculations should be admitted into the record as evidence. Therefore, the Defendants' objection to the Plaintiff's testimony on damage calculations using the 2007 and 2008 tax returns of AMP Services is overruled.

### C.      Spoliation of Evidence

In February of 2008, Hsu, individually, and as an agent for ICT, hired a cleaning crew to remove AMPS's items that remained in the office space leased by AMPS. [Finding of Fact No. 19.] Some twenty to thirty boxes of documents left in the building were thrown away. [Finding of Fact No. 19.] In his testimony, Hsu did not dispute that he authorized the documents to be destroyed or that he failed to examine the boxes' contents before authorizing the cleaning crew to dispose of the

---

produce the documents to the Trustee. [Finding of Fact No. 24.]

boxes. [Finding of Fact No. 26.]   The Plaintiff seeks sanctions against the Defendants for the destruction of business documents relating to AMPS.

1.    **Whether the issue of spoliation is one of substantive state law or federal evidentiary law.**

Spoliation is "'the destruction of evidence [or the] destruction, or the significant and meaningful alteration of a document or instrument.'" *Brewer v. Dowling*, 862 S.W.2d 156, 158 n.2 (Tex. App.—Fort Worth 1993, writ denied) (quoting Black's Law Dictionary 1257 (5th ed. 1979)). A trial court may presume that the evidence would have been unfavorable to the party who destroyed the evidence. *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003) (noting that this presumption has been a part of Texas jurisprudence for over a century). "The Fifth Circuit has allowed an adverse inference only where the circumstances of the destruction of potential evidence manifest bad faith, opining that, '[m]ere negligence is not enough, for it does not sustain an inference of consciousness of a weak case.'" *Union Pac. R.R., Co. v. Heartland Barge Mgmt., L.L.C.*, Nos. H-02-0438 & H-02-2314, 2006 WL 2850064, at *15 (S.D. Tex. Oct. 3, 2006) (quoting *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). Such "[e]videntiary 'presumptions' which merely permit an adverse inference based on unproduced evidence are . . . controlled by federal law." *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003).

However, because there are few Fifth Circuit cases outlining the imposition of spoliation sanctions, this Court will supplement its analysis by applying elements from Texas case law. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (recognizing that federal law governs, but nevertheless examining New York law); *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005) (noting that although federal law governs spoliation, the court applied Georgia

17

law); *see also Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994) (noting the disagreement on whether spoliation is an issue of substantive state law or federal evidence law).

Under Texas law, there are three elements to determine if spoliation of evidence has occurred: "(1) whether the accused party had a duty to preserve the evidence; (2) whether the accused party negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the other party's ability to present its case or defense." *Offshore Pipelines, Inc. v. Schooley*, 984 S.W.2d 654, 666 (Tex. App.—Houston [1st Dist.] 1998, no pet.) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 954-55 (Tex. 1998)).

### 2.    Bad Faith

Pursuant to Fifth Circuit precedent, for the Plaintiff to be entitled to such an adverse inference, the Plaintiff must show that the Defendants acted in "bad faith" by authorizing the cleaning crew to dispose of the boxes of documents. *Id.* (citing *Vick*, 514 F.2d at 737). Moreover, to impose sanctions upon the Defendants for spoliation of evidence, this Court must find that the Defendants acted in bad faith. *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 681 (S.D. Tex. 2007). Since Hsu had a duty to preserve the documents, acted intentionally in destroying the boxes of documents, [Finding of Fact No. 26], and gave conflicting testimony, [Finding of Fact No. 30], this Court finds that Hsu acted in bad faith in destroying the boxes left at the Debtor's place of business.

### 3.    The Duty to Preserve the Evidence

The duty upon the Defendants may be statutory, regulatory, or ethical. *Trevino*, 969 S.W.2d at 955. This Court finds that Hsu had a statutory duty under the Bankruptcy Code to preserve the documents he admittedly destroyed. According to § 727(a):

18

> The court shall grant the debtor a discharge, unless . . . (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions *might* be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3) (emphasis added).

While Hsu may not have known what each and every box contained, this Court finds that he had a duty to preserve documents as they were potentially relevant to current or future litigation. The record reflects that Hsu knew the Plaintiff had been to the building looking for documents relating to AMPS's business records. [Finding of Fact No. 27.] Hsu additionally knew that not all of the information on the hard drive was accurate. [Finding of Fact No. 27.] The Plaintiff testified that the only way to verify or correct those records was through obtaining the actual documents in the boxes. [Finding of Fact No. 27.] While Hsu asserts that the Plaintiff told him to "abandon everything" belonging to AMPS, Hsu failed to produce any document showing such authorization to abandon, and the Plaintiff testified that he never gave authorization for the destruction or other disposition of documents. [Finding of Fact No. 28.] This Court believes the Plaintiff, and not Hsu, on this issue.

### 4.    Negligent or Intentional Spoliation of Evidence

Once the Court determines that there was a duty, the Court must inquire as to whether the defendant breached that duty to preserve the evidence either negligently or intentionally. *See Trevino*, 969 S.W.2d at 957. "While parties need not take extraordinary measures to preserve evidence, they have a duty to exercise reasonable care in preserving *potentially* relevant evidence." *Adobe Land Corp. v. Griffin, L.L.C.*, 236 S.W.3d 351, 359 (Tex. App.—Fort Worth 2007, no pet.) (emphasis added).

Hsu testified that he had a "rough idea" of what each box of documents contained. [Finding of Fact No. 26.] Hsu inspected the twenty to thirty boxes of documents at his home, but not the boxes he disposed of without the Plaintiff's authorization. [Finding of Fact Nos. 26 & 28.]   There is conflicting evidence as to the relevance of the documents disposed of by Hsu.  In Hsu's deposition, he stated the documents thrown out were AMPS's financial documents. [Finding of Fact No. 30.] However, in his testimony at trial, he asserted that those documents had no relevance to the bankruptcy case. [Finding of Fact No. 30.]  Given Hsu's contradictory testimony—which casts a severe pall on his credibility—this Court concludes that Hsu failed to adequately prove that the destroyed documents were not of value to the Plaintiff, or that he took reasonable care to preserve necessary documents. Finally, this Court concludes that who disposed of the documents—Hsu or the cleaning crew—is irrelevant.  Whether acting as an agent of ICT and authorizing the destruction of the documents, or personally disposing of them, Hsu caused the destruction of the documents.

5.      **Prejudice to the Plaintiff's Case**

"The burden of the prejudicial effects associated with the failure to preserve [is] upon the culpable spoliating party rather than the innocent non-spoliating party." *Adobe Land Corp.*, 236 S.W.3d at 359. Since Hsu did not inspect the documents in the boxes that he destroyed, but instead only had a "rough idea" of what each box contained, [Finding of Fact No. 26], he failed to state with any certainty what effect the documents may have had on the Plaintiff's case. Conversely, the Plaintiff testified that through Hsu's inability to produce documents, he has been unable to verify the financial records of the Debtor and therefore unable to ascertain the Debtor's financial situation as of the Petition Date, particularly in regards to the services portion of the Debtor's business. [Finding of Fact No. 29.] This inability has caused prejudice to the Plaintiff's case.

6.      **Sanctions for Spoliation of Evidence**

Sanctions are imposed to prevent abuse of the judicial system. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (Included in a federal court's inherent powers is "the ability to fashion an appropriate sanction for conduct which abuses the judicial process."). The Court may sanction bad faith conduct through its inherent powers, by statute, or through the rules of procedure. *Id.* at 50. Where a party's conduct is of such a disturbing nature that it is not adequately redressed through the rules, a court may rely on its inherent powers to impose sanctions. *Carroll v. The Jaques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997). However, there must be a specific finding that a party acted in bad faith to impose sanctions through the Court's inherent powers. *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952 (5th Cir. 2001). "If a party with a duty to preserve evidence fails to do so and acts with culpability, a court may impose appropriate sanctions." *Smith*, 365 B.R. at 681; *see also Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 339 (M.D. La. 2006). Given Hsu's conduct with respect to the documents discussed above, this Court concludes that Hsu acted in bad faith. Therefore, the Court concludes that Hsu and his company, ICT, should be sanctioned and will take into account Hsu's spoliation of evidence when determining whether exemplary damages are appropriate. *See infra* Part IV.J.

D.      **Breach of Fiduciary Duty and Usurpation of Business Opportunities**

The Court concludes the Defendants breached their fiduciary owed to AMPS (the Debtor) and AMPS's creditors. The Trustee asserts that because the Defendants used the property of AMPS to establish a new entity, AMP Services, without compensating AMPS for that property, they breached their fiduciary duties to AMPS and AMPS's creditors.

To prove that the Defendants breached their fiduciary duty, the Trustee must prove three elements: "(1) a fiduciary relationship between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied)).

The fact that the Plaintiff in this suit is the Trustee, and not the creditors, is of no consequence. The Trustee has standing to pursue the breach of fiduciary duty against the Defendants. "While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper v. Litton*, 308 U.S. 295, 307 (1939). "The trustee does not stand in the shoes of a bona fide third party on a breach of fiduciary duty claim. Rather, with regard to non-core state law claims, he stands in the shoes of the debtor as of the time of the claim." *Sherman v. FSC Realty LLC (In re Brentwood-Lexford Partners, LLC)*, 292 B.R. 255, 272 (Bankr. N.D. Tex. 2003); *see also* 11 U.S.C. § 544; *Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 385 (5th Cir. 2008) ("[A] trustee, as the representative of the bankruptcy estate, is the real party in interest, and is the only party with standing to prosecute causes of action belonging to the estate once the bankruptcy petition has been filed."). Accordingly, in the interest of the Debtor's estate, the Trustee stands in the shoes of the Debtor and has standing to pursue the breach of fiduciary duty claim against the Defendants.

1.      **The Fiduciary Relationship Between the Plaintiff and Defendants**

The Court concludes that a fiduciary relationship exists between the Plaintiff and the

Defendants. "The Texas Supreme Court has stated that it 'is impossible to give a definition of the term

[fiduciary] that is comprehensive enough to cover all cases.' Generally speaking, though, the term

'contemplates fair dealing and good faith' and 'refers to integrity and fidelity.'" *Navigant Consulting,*

*Inc.*, 508 F.3d at 283 (quoting *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 199 (Tex. 2002))

(internal marks and citations omitted).

A fiduciary relationship exists between corporate officers or directors to the corporations they

serve. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *see also Lifshutz v.*

*Lifshutz*, 199 S.W.3d 9, 18-19 (Tex. App.—San Antonio 2006, pet. denied) ("Corporate officers owe

fiduciary duties to the corporations they serve."). This duty requires that corporate officers and

directors act in the corporation's and shareholders' best interests. *Hughes v. Houston Nw. Med. Ctr.,*

*Inc.*, 680 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Part of this

obligation is to refrain from usurping corporate opportunities for personal gain. *Lifshutz*, 199 S.W.3d

at 18. If an officer or director does so, he is directly accountable to the corporation for the profits. *Id.*

(citing *Holloway*, 368 S.W.2d at 577). "A director who diverts profits from the corporation in

violation of his fiduciary relationship is personally liable even though the profits are acquired by an

agency controlled by the director." *Holloway*, 368 S.W.2d at 577. Specifically, when a debtor

corporation is insolvent, the officers of that insolvent corporation owe a fiduciary duty to creditors.

*See ASARCO*, 396 B.R. at 415 ("[D]irectors owe fiduciary duties to creditors of the corporation when

it is insolvent because when a corporation is insolvent the creditors' risks are at stake."); *see also In*

23

*re Mirant Corp.*, 326 B.R. 646, 651 (Bankr. N.D. Tex. 2005) (citing Delaware's well-established principle of law that creditors are owed fiduciary duties when a corporation is insolvent).

Hsu both owns and controls ICT, which in turn owned a 75% interest in the Debtor, AMPS. [Finding of Fact No. 2.] Beginning in January 2007, Hsu began making executive decisions for AMPS. [Finding of Fact No. 7.] Such decisions included the firing of the chief executive officer and the chief financial officer, and the filing of a Chapter 7 petition. [Finding of Fact Nos. 7 & 12.] Hsu's ownership interest in the Debtor, as well as his own actions, made him a corporate officer and imposed upon him a fiduciary duty to AMPS and AMPS's creditors.

### 2.    Breach of Fiduciary Duty

"The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his personal interest to prevail over the interest of the corporation." *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984) (citing *Holloway*, 368 S.W.2d at 576). "An officer or director is considered 'interested' if he or she . . . makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity." *Floyd v. Hefner*, 556 F. Supp. 2d 617, 649 (S.D. Tex. 2008). "'Texas corporation law applies the "corporate opportunity" doctrine where a corporation has a legitimate interest or expectancy in, and the financial resources to take advantage of, a particular business opportunity.'" *United Teachers Ass'n Ins. Co. v. MacKeen & Bailey, Inc.*, 99 F.3d 645, 650-51 (5th Cir. 1996) (quoting *In re Safety Int'l, Inc.*, 775 F.2d 660, 662 (5th Cir. 1985) (internal citations omitted)). When a corporate officer or director diverts a corporate opportunity to himself, he breaches his fiduciary duty of loyalty to the corporation. *Id.*

By using the assets of AMPS in establishing the business of AMP Services, the Defendants have diverted the profits of the only viable business of AMPS—i.e. the services business of AMPS.

24

AMP Services was created in February 2007, nearly six months before Hsu filed the Chapter 7 petition on behalf of AMPS. [Finding of Fact No. 8.] In establishing AMP Services, the Defendants used AMPS's same acronym, phone number, address, employees, customers, vendors, and suppliers. [Finding of Fact No. 9.] As few as three days and as many as four months post-petition, checks from AMPS's suppliers and customers made out to "AMPS" began coming in to AMP Services for services rendered post-petition totaling $30,717.91. [Finding of Fact No. 18.] Additionally, the Defendants sent an undated letter to "valued customers" of AMPS offering to service and provide technical support for products built by AMPS. [Finding of Fact No. 11.]

After the Petition Date, the Defendants performed post-petition services in the name of the Debtor, including, but not limited to, the following: receiving invoices and purchase orders from AMPS, ordering component parts, and purchasing other equipment necessary to the continued operation of AMP Services. [Finding of Fact No. 18.] These post-petition transactions started on July 25, 2007 and continued until mid-January 2008. [Finding of Fact No. 18.] Such transactions constitute a breach of fiduciary duty owed by the Defendants to AMPS and AMPS's estate administered by the Trustee in the Debtor's bankruptcy case.

**3.     The Breach Resulted in Injury to the Plaintiff**

"Texas courts have uniformly recognized and held that 'good will' is property; that it may be the subject of bargain and sale; that it may be damaged or destroyed, and is like other property with respect to the right of the owner to recover damages for its destruction and, as such, 'good will' although intangible, is an integral part of the business, the same as the physical assets of the business." *Taormina v. Culicchia*, 355 S.W.2d 569, 573 (Tex. Civ. App.—El Paso 1962, writ ref'd n.r.e.). "The value of a professional practice owned by a debtor as of the commencement of a bankruptcy case is

25

attributable to many different assets . . . some of its value may derive from the practice's intangible assets, such as goodwill. Goodwill includes the practice's name recognition, consumer brand loyalty, or special relationships with suppliers or clients." *Ackerman v. Schultz (In re Schultz)*, 250 B.R. 22, 35 (Bankr. E.D.N.Y. 2000) (internal citations omitted); *see also Sheppard's Dental Ctrs., Inc. v. Sw. SDC, Inc. (In re Sheppard's Dental Ctrs., Inc.)*, 65 B.R. 274, 278 (Bankr. S.D. Fla. 1986) (setting aside transfers made depriving the estate of assets without fair consideration, including assets such as "goodwill, telephone numbers used . . . prior to [the] proceedings, and other similar intangible property.").

The property that Hsu converted for use by AMP Services is considered property of the estate, and its continued use demands compensation. The Defendants had a duty to use these assets for the benefit of AMPS and the creditors of AMPS. Rather than using the assets to maintain the business of the already formed AMPS, the Defendants chose to incorporate a new business—AMP Services—and then provide the same services as AMPS had been providing. Despite their duty to AMPS, the Defendants chose to use the intangible assets to profit AMP Services instead. These acts are in direct contradiction of Hsu's duties as a corporate officer not to usurp the corporate opportunities of AMPS. Because the Defendants diverted these assets away from the Debtor's estate, the estate lost the potential to generate income, and therefore the Debtor was injured by Hsu's breach of his fiduciary duty.

In sum, the Court concludes that the Trustee has satisfied all requisite elements for proving that the Defendants breached their fiduciary duty and usurped corporate opportunities belonging to the Debtor's estate. Accordingly, the Defendants should be held jointly and severally liable for breach of fiduciary duty and usurpation of business opportunities.

26

4.      **The absence of Bankruptcy Code § 721 authorization for the Trustee to operate the Debtor's business is not a defense to the usurpation of business opportunities claim.**

Moreover, the Defendants may not use the absence of § 721 authorization as a defense to usurpation of business opportunities. Section 721 of the Bankruptcy Code discusses the Court's ability to authorize a Chapter 7 trustee to operate the business of a debtor in the interest of liquidating the estate. Section 721 states as follows:

> The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate.

11 U.S.C. § 721. The principal duty of a Chapter 7 trustee is to "'collect and reduce to money the property of the estate for which [he] serves, and to close such estate as expeditiously as is compatible with the best interests of the parties in interest.'" *In re A & T Trailer Park*, 53 B.R. 144, 146 (Bankr. D. Wy. 1985) (quoting 11 U.S.C. § 704(a)(1)).

In the suit at bar, a lack of explicit authorization pursuant to § 721 to conduct the Debtor's business does not provide the Defendants with a defense of usurpation of business opportunities. Although § 721 empowers the Court to authorize a trustee to "operate the business of the debtor for a limited period," the language of the statute states that the Court *may*, not must, authorize a Chapter 7 trustee to operate a debtor's business. 11 U.S.C. § 721. In the few opinions that have found § 721 authorization necessary, the trustees were attempting to operate or to expand the businesses as going concerns. *See, e.g.*, *Reed v. United States*, No. 3:05-CV-1836-M, 2006 WL 1152719, at *4 (N.D. Tex. May 2, 2006); *In re Weiner*, 7 F. Supp. 691, 692 (D. Pa. 1932). The circumstances in the instant suit are distinguishable because the Plaintiff did not testify, nor did the Defendants allege, that the Trustee intended to operate, or expand the operations of, AMPS as a going concern prior to the liquidation of

27

the business.  Rather, the Trustee would have attempted to sell AMPS's Assets as expeditiously as possible.  Additionally, based on the uncontroverted testimony of the Plaintiff regarding the business opportunities that were usurped, the Plaintiff would not have needed to seek § 721 authorization because the liquidation activities he planned to undertake would not have been considered "conducting the business."  *Reed*, 2006 WL 1152719, at *4 (noting that working to liquidate a business does not constitute operating the business).  Even if the Trustee had contracted to complete any outstanding work orders, this action would still not constitute operating the business requiring § 721 authorization.  See *In re Bodin Apparel Inc.*, 46 B.R. 555, 561 (Bankr. S.D.N.Y. 1985) ("Activities incidental to the liquidation of a corporation do not constitute conducting business."); *see In re Duke*, 15 F.2d 92, 93 (D. Mo. 1924) (receiver who hired employees for a short time to finish caps in order that they might be sold as finished caps rather than pieces of cloth did not "conduct the business").  There is no evidence to support an allegation that the Trustee planned to do anything other than fulfill his duty of promptly liquidating whatever assets AMPS had or should have had on the Petition Date.

In sum, in the Debtor's main case at bar, the Trustee needed no § 721 authorization from this Court, and the lack of such authorization does not provide the Defendants with a defense to the Trustee's claim for usurpation of business opportunities.

**E.     Conversion of Estate Assets**

Another cause of action asserted by the Plaintiff is conversion of estate assets.  "Conversion occurs when a person makes an unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion or inconsistent with the owner's rights."  *Leal v. Mokhabery (In re Leal)*, 360 B.R. 231, 240-41 (Bankr. S.D. Tex. 2007) (citing *Waisath v.*

28

*Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)).  A manual taking of the property is not necessary for conversion. *Waisath*, 474 S.W.2d at 447.

During the establishment of and subsequent operation of AMP Services, the Defendants converted estate assets in the form of tangible and intangible property, including AMPS's Assets. [Finding of Fact No. 9.]  The Defendants owned and controlled AMPS. [Finding of Fact Nos. 2, 7, & 9.]  In February 2007, when Hsu incorporated AMP Services and transferred the service portion of AMPS into the new entity AMP Services [Finding of Fact Nos. 8 & 9], the last viable component of AMPS ceased to have value.

The new business, AMP Services, occupied the same office space as AMPS, used AMPS's telephone number, vendor information, customer lists, and performed the same or similar services for customers that had previously done business with AMPS.  [Finding of Fact No. 9 & 11.]  The timing of the incorporation of AMP Services, as well as the letter sent to AMPS's customers referencing a "re-organization" and other statements, indicate an overlap in the companies' which supports a finding of conversion. *See Rekerdres, et al. v. Seals (In re Rekerdres & Rekerdres Ins. Agency, Inc.)*, 68 F.3d 467 (5th Cir. 1995) (finding a defendant using customer lists, similar name, and same office space in starting a new company converted the assets of the debtor company).  Indeed, the Defendants' actions made it very difficult, if not virtually impossible, for any of AMPS's tangible and intangible assets to be liquidated for the benefit of the Debtor's bankruptcy estate.  Therefore, the Court concludes that the Defendants' actions constitute conversion, and the Defendants are liable for damages caused by the conversion of AMPS's property interests.

**F.      Liability Under 11 U.S.C. §§ 541 and 542: Turnover of Property of the Estate**

The Trustee also asserts a cause of action under 11 U.S.C. §§ 541 and 542.  Specifically, the Trustee argues that under § 541, property of the Debtor's estate includes the tangible and intangible property transferred from AMPS to AMP Services and that pursuant to § 542, this property must be turned over to the bankruptcy estate.  This Court agrees with the Trustee.

Once a Chapter 7 petition is filed, the Bankruptcy Code provides procedures for the identification and turnover of a Chapter 7 debtor's assets.  The commencement of a bankruptcy case creates an estate comprised of all of a debtor's interests in property, subject to administration for the benefit of that debtor's creditors.  11 U.S.C. § 541(a); *In re Pinson*, No. 05-38800-H3-7, 2007 WL 3256207, at *3 (Bankr. S.D. Tex. Nov. 2, 2007).  "Section 541 of the Bankruptcy Code defines property included within the bankruptcy estate to include 'all legal and equitable interests of the debtor in property as of the commencement of the case' and 'proceeds . . . or profits of or from property of the estate.'"  *In re Equinox Oil Co.*, 300 F.3d 614, 618 (5th Cir. 2002) (quoting 11 U.S.C. § 541(a)(1) & (6)).  "Congress intended this provision to be quite broad, not limited to the definition of 'proceeds' set forth in the Uniform Commercial Code, 'but encompassing any conversion in the form of property of the estate, and anything of value generated by property of the estate.'"  *McLain, et al. v. Newhouse (In re McLain)*, 516 F.3d 301, 312 (5th Cir. 2008) (quoting *In re Hanley*, 305 B.R. 84, 86-87 (Bankr. M.D. Fla. 2003)).  Under 11 U.S.C. § 541(a)(7), the bankruptcy estate also includes "[a]ny interest in property that the estate acquires after the commencement of the case."  11 U.S.C. § 541(a)(7).  Through § 541(a)(7), Congress clarified its intention that § 541 be an "all-embracing definition and to ensure that property interests created with or by property of the estate themselves property of the estate."  *McLain*, 516 F.3d at 312 (quoting 124 Cong. Rec. H11096 (daily ed. Sept. 28, 1978)).

Because § 541(a) provides such a sufficiently broad definition, the property of the estate includes the intangible and tangible property held by the Debtor as of the Petition Date and is only limited by the exceptions[7] outlined in § 541(b). *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983); *In re Equinox Oil Co.*, 300 F.3d at 618; *In re Martin*, No. 08-46189-DML, 2009 WL 1911760, at *1 (Bankr. N.D. Tex. July 2, 2009). Additionally, other Bankruptcy Code provisions[8] bring into the estate property in which the Debtor did not have a possessory interest prepetition. *Whiting Pools*, 462 U.S. at 205; *see In re Equinox Oil Co., Inc.*, 300 F.3d at 618.

Therefore, § 541 includes the tangible and intangible assets that AMPS owned on the date of the filing of the Debtor's petition. These assets include AMPS's intangible assets (i.e. AMPS's Assets) associated with the operation of its business. *See Moore v. Brewer (In re HMH Motor Servs., Inc.)*, 259 B.R. 440, 451-52 (Bankr. S.D. Ga. 2000) (holding that intangibles include name, relationships with customers and parties dealing with the debtor, goodwill, and telephone numbers); *In re Schultz*, 250 B.R. at 35 (stating the value of a professional practice owned by a debtor is attributable to many different assets including human capital, goodwill, name, recognition, consumer brand loyalty, or special relationships with suppliers or clients); *U.S. Trust Co. v. Raritan River Steel Co., Inc. (In re Am. Spring Bed Mfg. Co.)*, 153 B.R. 365, 369 (Bankr. D. Mass. 1993) (finding, in order to satisfy a debt with a creditor, a debtor sold goodwill including, but not limited to, trade names, trademarks, brand names, and customer lists because all of those assets had significant value). Therefore, AMPS's Assets, which the Defendants used in connection with the AMP Services' business, are property of the bankruptcy estate pursuant to § 541.

---

[7] None of these exceptions are applicable to the suit at bar. *See* 11 U.S.C. § 541(b).

[8] *See, e.g.*, 11 U.S.C. §§ 543, 547, & 548 (allowing the Trustee to require turnover of property that is in the possession of others due to a custodial arrangement (§ 543), a preferential transfer (§ 547), or a fraudulent transfer (§ 548)).

While § 541 defines the extent of property of the estate, § 542 sets forth the requirements for turning over property of the estate.  Section 542 provides that

> [A]n entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a).  Ultimately, any trustee may use, sell, or lease this property for the benefit of the estate and any entity in possession of such property must therefore turnover and account for this property. *See Welt v. Jacobson, et al. (In re Aqua Clear Techs., Inc.),* 361 B.R. 567, 585 (Bankr. S.D. Fla. 2007).

In the suit at bar, the Defendants assumed and exercised control over AMPS's service business and AMPS's Assets.  [Finding of Fact No. 9.]  Thus, pursuant to § 542, the Court concludes that the Defendants must deliver to the Trustee, and account for, such property—or the value of such property—for the benefit of the Debtor's creditors.  Because AMPS's Assets are intangible property, the Court will restore the value of this property to the bankruptcy estate by awarding damages to the Plaintiff in an amount to be discussed *infra* Part IV.J.

## G.    Liability Under 11 U.S.C. §§ 549 and 550: Post-Petition Transfers

As an additional cause of action, the Trustee in this suit argues that the Defendants are liable pursuant to §§ 549 and 550 because of several post-petition transfers.  The Defendants contacted and invoiced former customers of AMPS, accrued further debt on behalf of the Debtor, and generally continued the operation of the service side of AMPS under the guise of AMP Services.  [Finding of Fact Nos. 9 & 11.]  Under §§ 549 and 550, these are post-petition transfers, and the value of the property transferred post-petition should be returned to the Debtor's estate.

Under § 549(a), the Trustee may avoid a transfer of estate property: "(1) that occurs after the commencement of the case; and (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court." 11 U.S.C. § 549(a).  To avoid such a post-petition transfer, the Trustee must prove: "(1) that a transfer occurred; (2) that the transfer occurred after the commencement of the case; (3) that the transfer was made without court authority; and (4) that the property transferred was property of the estate." *Havis v. Norman (In re Equator Corp.)*, 362 B.R. 326, 331 (Bankr. S.D. Tex. 2007) (citing 11 U.S.C. § 549); *In re Mullican*, No. 05-44423, 2008 WL 5191196, at *11 (Bankr. E.D. Tex. 2008).

Consequently, "[t]o the extent that a transfer is avoided under § 549, the trustee may recover the property transferred from the initial transferee or the entity for whose benefit the transfer was made or any immediate or mediate transferee of such initial transferee." *In re Equator Corp.*, 362 B.R. at 336 (citing 11 U.S.C. § 550(a)).  In this suit, the Trustee meets the § 549 requirements because the Defendants transferred property that belonged to the Debtor's estate after the Petition Date without authorization from the Court, the Trustee, or the Bankruptcy Code.  The Court examines each element of § 549(a) in turn.

### 1.   A transfer of property occurred.

For liability under § 549, first there must be a transfer of property.  Section 101(54) "defines a transfer as 'every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property.'" *In re Equator Corp.*, 362 B.R. at 331 (quoting 11 U.S.C. § 101(54)).  The Defendants transferred assets including, but not limited to, AMPS's Assets and monies collected from the operation of AMP Services using AMPS's Assets. [Finding of Fact No. 18.]  Therefore, a transfer of property occurred.

33

2.      **The transfer occurred after the commencement of the case.**

Second, this transfer of property must have occurred after the Petition Date, which was July 10, 2007. [Finding of Fact No. 12.] The Defendants contacted clients to address the confusion between AMPS and AMP Services because both had the same acronym. [Finding of Fact No. 11.] After the Petition Date, AMP Services continued to invoice clients under "AMPS" even though such invoicing was misleading. From July 25, 2007 to January 2008, AMP Services invoiced AMPS's clients and collected monies. [Finding of Fact No. 18.] Since all of these dates are after July 10, 2007, the transfer of property occurred post-petition.

3.      **The transfer was made without authority from the Trustee, the Court, or the Code.**

The third element that the Trustee must prove is that neither this Court, the Trustee, or the Bankruptcy Code authorized the transfers which Hsu effectuated while in control of the Debtor. Here, neither this Court nor the Trustee ever gave authority to Hsu to transfer any of the Debtor's assets to AMP Services or, for that matter, to any other entity. [Finding of Fact No. 14.] Moreover, there is no statute under the Bankruptcy Code that gave him any such authorization. Accordingly, the Trustee has satisfied this element.

4.      **The property transferred was property of the estate.**

To satisfy the final requirement of § 549(a), the assets transferred must be property of the estate. As discussed in Part IV.F *supra*, the broad definition in § 541 defines property of the estate broadly, and therefore includes the property which the Defendants transferred. Moreover, the Defendants' continued operation of the service side of AMPS generated cash for AMP Services after the Petition Date, and, pursuant to §§ 541(a)(6) & (7), these monies belong to the Debtor's estate.

34

Because the transferred property to AMP Services was a viable component of AMPS, any future cash generated from that property during this bankruptcy case constitutes property of the Debtor's estate. 11 U.S.C. §§ 541(a)(6) & (7). This amount includes: (a) monies received from payment of AMPS's invoices; (b) monies collected from AMPS's accounts receivable; and (c) future revenues generated from use of AMPS's customer lists as well as from equipment purchased with proceeds which should have gone to AMPS.

In sum, all four elements of § 549(a) are met in this suit for the transfers to be properly classified as post-petition transfers. Under § 550, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders the value of such property." 11 U.S.C. § 550(a). The Trustee may therefore recover from either "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. §§ 550(a)(1) & (2).

Although this Court has discussed that the Defendants' fraudulent transfer of AMPS's assets may be recovered as fraudulent post-petition transfers pursuant to § 549, this same property, or its value, could alternatively be recovered under § 548 as fraudulent transfers.

## H.    Fraudulent Transfers Under the Bankruptcy Code and Texas Law

### 1.    Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(A).

The Trustee argues that, pursuant to 11 U.S.C. § 548(a)(1)(A), he should be able to avoid the transfers of tangible and intangible property made to AMP Services during the six-month period before the petition was filed because such transfers are fraudulent transfers. Specifically, the Trustee argues that the Defendants transferred property of the Debtor with the intent to defraud the Debtor's creditors. See 11 U.S.C. § 548(a)(1)(A). The Defendants argue that the Trustee failed to meet his burden of

proof with regard to the required elements. The Court disagrees and concludes that the Trustee is entitled to avoid these transfers pursuant to 11 U.S.C. § 548(a)(1)(A).

To prevail on a claim for fraudulent transfer under § 548(a)(1)(A), the Trustee must prove the following elements of § 548(a)(1)(A): (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; and (3) the transfer was made with actual intent to hinder, delay, or defraud the Debtor's creditors. *See* 11 U.S.C. § 548(a)(1)(A); *see also Havis v. AIG Sunamerica Life Assurance Co. (In re Bossart)*, No. 06-3540, 2007 WL 4561300, at *8 (Bankr. S.D. Tex. Dec. 21, 2007).

The first issue is whether AMP Services' telephone number, name, acronym, customer information, address, vendor information, and competitive advantages in the forms of goodwill and specialized knowledge (i.e. AMPS's Assets) were the Debtor's property. This Court concludes AMPS's Assets were indeed the Debtor's property. Before the filing of the Chapter 7 petition, the Debtor had a viable service business. [Finding of Fact No. 6.] The service business was part of AMPS's Assets. [Finding of Fact No. 9.] On February 20, 2007, Hsu created a corporation named AMP Services. [Finding of Fact No. 8.] AMP Services not only had a very similar name to the Debtor (AMPS), but also used the same acronym, address, and phone number as the Debtor. [Finding of Fact No. 9.]

With this new identity, which is identical to the Debtor's in virtually every respect, AMP Services began contacting the Debtor's vendors and customers. [Finding of Fact No. 11.] In addition, AMP Services performed essentially the same business as the services division of the Debtor. [Finding of Fact No. 11.] At this point, the service division of the Debtor ceased to exist because AMP Services had completely swallowed it up. For these reasons, the Court concludes that AMP Services' telephone

36

number, name, acronym, customer information, address, vendor information, and competitive advantages in the forms of goodwill and specialized knowledge were the Debtor's property, thereby satisfying the first element. *See* 11 U.S.C. § 548(a)(1); *see also Havis*, 2007 WL 4561300, at *8.

The second issue is whether the transfer was made within two years of the Petition Date. The Court concludes that it was. The Debtor filed its Chapter 7 petition on July 10, 2007. [Finding of Fact No. 12.] Therefore, to satisfy the second element of § 548(a)(1)(A), the transfer must have occurred between July 10, 2005 and July 10, 2007. AMP Services' was incorporated by Hsu on February 20, 2007. [Finding of Fact No. 8.] In AMP Services' incorporation papers, the address listed is the same as the Debtor's. [Finding of Fact No. 9.]

In addition, when the Debtor filed its bankruptcy petition, operations at AMPS had essentially ceased. [Finding of Fact No. 10.] Indeed, only fifteen days after the Petition Date, AMP Services, using the same phone number as the Debtor, had issued an invoice to a customer for generator services. [Finding of Fact No. 18.] As such, the Court concludes that prior to the Petition Date, the Defendants had already transferred AMPS's Assets no earlier than two years prior to the Petition Date. Thus, the second element under 11 U.S.C. § 548(a)(1)(A) is met.

The third issue is whether the transfer was made with actual intent to hinder, delay, or defraud the Debtor. This Court concludes that the Defendants had actual intent. Prior to the Petition Date, Hsu created an entity virtually identical to the services division of the Debtor. [Finding of Fact No. 8.] The services division was the only viable asset of the Debtor. [Finding of Fact No. 6.] AMP Services used AMPS's Assets in establishing its business. [Finding of Fact No. 9.] The Trustee discovered AMP Services' existence by erroneously receiving several invoices and checks intended for AMP Services. Indeed, AMP Services was actively pursuing the Debtor's clients and performing the same business

37

as the services division of the Debtor. [Finding of Fact No. 11.] Under these circumstances, this Court concludes that Hsu took these actions with the intent to defraud the Debtor of its only viable asset, its services business. Therefore, the third and final element of 11 U.S.C. § 548(a)(1)(A) is satisfied.

In sum, the Trustee has satisfied all three elements required to avoid a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A).

### 2.    Fraudulent Transfers under 11 U.S.C. § 548(a)(1)(B).

Section 548(a)(1)(B) provides a separate and distinct reason why this Court concludes the Trustee may avoid the transfer of tangible and intangible property made from AMPS (when Hsu was in charge) to AMP Services during the six-month period before the Petition Date. Specifically, the Trustee argues that Hsu, AMP Services, and ICT transferred AMPS's Assets without providing reasonably equivalent value in exchange for the transfers. *See* 11 U.S.C. § 548(a)(1)(B). The Defendants, however, argue that the Trustee failed to meet his burden of proof with regard to these elements. The Court disagrees and concludes that the Trustee has established that he is entitled to avoid these transfers under 11 U.S.C. § 548(a)(1)(B).

To prevail on a claim for fraudulent transfer under § 548(a)(1)(B), the Trustee must demonstrate that: (1) a transfer was made of the Debtor's property; (2) the transfer was made within two years of the Petition Date; (3) the Debtor received less than reasonably equivalent value in exchange for such transfer; and (4) the Debtor was insolvent at the time of such transfer. *See* 11 U.S.C. § 548(a)(1)(B)(i)-(ii).

The first two elements of § 548(a)(1)(B)—which are nearly identical to two of the three elements of § 548(a)(1)(A)—have previously been discussed and are satisfied. *See supra* Part IV.H.1.

Therefore, the Court now examines the third element—whether the Debtor received less than reasonably equivalent value in exchange for the transfer. In 2007 alone, AMP Services generated $134,056.00 in gross profits using the Debtor's assets. [Finding of Fact No. 22.] These profits indicate that there was value in AMPS's Assets. However, nowhere in the Debtor's records is there any indication that the Defendants or AMP Services gave anything of value in return for the transfer and use of the Debtor's assets. Thus, not only did the Debtor receive less than reasonably equivalent value, the Debtor received no value at all. Therefore, the third element of 11 U.S.C. § 548(a)(1)(B) is satisfied.

The fourth and final element—whether the Debtor was insolvent at the time of the transfer—is met. Under the Bankruptcy Code, a corporate debtor is "insolvent" when "the sum of such entity's debt is greater than all of such entity's property, at a fair valuation." 11 U.S.C. § 101(32). On the Petition Date, AMPS was not operating as an ongoing business. [Finding of Fact No. 10.] According to the very reliable testimony of the Trustee, the Debtor had over $1,500,000.00 in debts, including a secured loan from Merrill Lynch with a balance owing of approximately $900,000.00. [Finding of Fact No. 16.] The Trustee, an accountant by profession, also credibly testified that the Debtor had tangible assets with little or no value. [Finding of Fact No. 17.] Therefore, the amount of the Debtor's liabilities exceeded the value of all of the Debtor's tangible property as of the Petition Date. The Debtor was therefore insolvent on the Petition Date unless the Debtor's intangible assets exceeded $1,500,000.00. In the Debtor's schedules, which are signed by Hsu, there are no material intangible assets listed. [Main Case No. 07-34646, Docket Nos. 1 & 6.] Accordingly, the Court concludes that the Debtor was insolvent at the time of the transfers of the Debtor's property effectuated by Hsu.

In sum, the Trustee has satisfied all four elements required to avoid a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). Therefore, the Court concludes that § 548(a)(1)(B) is an additional reason why the Trustee is entitled to a judgment against the Defendants in the amount of damages as discussed *infra* Part IV.J.

As noted earlier, § 550 sets forth liability of a transferee in the event of an avoided transfer. *See* 11 U.S.C. § 550. Section 550 provides that to the extent that a transfer is avoided under § 548, a trustee may recover, for the benefit of the estate, the property transferred or its value to be paid by "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. §§ 550(a)(1) & (2). Taken together, §§ 548 and 550 ensure that in the event that property is not included in the bankruptcy estate—specifically, when it has been fraudulently transferred—parties have a course of action to recover that property or its value. Ultimately, the property is for distribution to the Debtor's creditors, and the Code seeks to ensure that all property belonging to the Debtor's estate is available for such distribution and payment of claims. Accordingly, because the Defendants' prepetition transfers constitute fraudulent transfers pursuant to § 548, this Court concludes that the Defendants should compensate the Trustee for the value of the fraudulently transferred assets pursuant to § 550(a)(1).

### 3.    Fraudulent Transfers under Texas Law

Under 11 U.S.C. § 544, the Trustee may avoid any transfer incurred by the Debtor that is voidable under applicable law. As such, the Trustee argues that the transfers made by the Defendants are also fraudulent transfers under Texas law, pursuant to section 24.006(a) of the Texas Uniform Fraudulent Transfer Act (TUFTA). To prevail on a claim for fraudulent transfer under section 24.006(a), the Trustee must demonstrate that: (1) the transfers were made without the Debtor receiving

a reasonably equivalent value in exchange for the transfers; (2) the Debtor was insolvent at the time of the transfers; (3) a creditor exists whose claim arose before the occurrence of the transfers for whom the Trustee may act; and (4) the cause of action arose within four years after the transfers were made. *See* Tex. Bus. & Com. Code Ann. §§ 24.006(a) & 24.010(a)(2). The Defendants argue that the Trustee has failed to meet his burden of proof for his state law claim. The Court disagrees.

The first two elements of section 24.006(a)—which are nearly identical to two of the four elements of § 548(a)(1)(B)—have previously been discussed and are satisfied. *See supra* Part IV.H.2. Accordingly, the Court now examines the third element—whether a creditor exists whose claim arose before the transfers were made. The Court concludes there was. Merrill Lynch's claim arose before the fraudulent transfers were made. Merrill Lynch, a creditor in the main bankruptcy case, provided a loan to AMPS of approximately $900,000.00 on February 19, 2002. [Finding of Fact No. 4.] At the earliest, any fraudulent transaction occurred on February 10, 2007—the day AMP Services was incorporated. [Finding of Fact No. 8.] Therefore, the Court concludes that a creditor existed before the fraudulent transfers were made.

The final issue is whether the cause of action arose within four years after the transfers were made. The Court concluded that it did. At the earliest, the fraudulent transfer of AMPS's Assets occurred on February 10, 2007, the date AMP Services was incorporated; and this adversary proceeding was initiated on May 28, 2008. [Finding of Fact Nos. 8 & 20.] Thus, because the filing of the Complaint occurred within the four-year period required by section 24.006(a), the Court concludes that the cause of action arose within four years after the transfers were made. Therefore, pursuant to section 24.006(a) of TUFTA, the transfers made to AMP Services within four years of the cause of action are fraudulent transfers under Texas law.

41

In sum, the Defendants are liable for fraudulent transfers under the Bankruptcy Code and under Texas law. The amount of damages that ultimately should be awarded to the Plaintiff is discussed *infra* Part IV.J.

I.    **The Defendants' claims for monies recovered by the Plaintiff are subordinate to the Plaintiff's and any other creditor's claims for damages pursuant to 11 U.S.C. § 510.**

Neither ICT or Hsu, individually or as an agent of ICT, filed a proof of claim. However, the Trustee, out of an abundance of caution, requests that any claims which the Defendants have for monies recovered by the Trustee be subordinated to the Trustee's claims for damages and any other creditor's claim against the estate. Under 11 U.S.C. § 510, the Court may, "(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate." 11 U.S.C. § 510(c)(1)-(2).

The Fifth Circuit instructs that equitable subordination is remedial in nature, and is rarely granted unless all parts of the following three prong test are satisfied: "(1) the claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code." *In re Fabricators, Inc.*, 926 F.2d 1458, 1464-65 (5th Cir. 1991) (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)); *Smith v. Assocs. Commercial Corp. (In re Clark Pipe & Supply Co.)*, 893 F.2d 693, 699 (5th Cir. 1990). The Fifth Circuit has typically found equitable subordination in only three instances: "'(1) when a fiduciary of the debtor misuses his position to the disadvantage of other

creditors; (2) when a third party controls the debtor to the disadvantage of other creditors; and (3) when a third party actually defrauds other creditors.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. by & through Mabey (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 357 (5th Cir. 1997) (quoting *U.S. Abatement Corp. v. Mobil Exploration & Producing U.S., Inc. (In re United States Abatement Corp.)*, 39 F.3d 556, 561 (5th Cir. 1994)).

Although the Fifth Circuit has yet to precisely define the exact parameters of inequitable conduct, such conduct does include fraud, illegality, and breach of fiduciary duties. *Summit Coffee Co. v. Herby's Foods (In re Herby's Foods)*, 2 F.3d 128, 131 (5th Cir. 1993). This Court has already found that there has been a breach of fiduciary duty, fraudulent transfers, and conversion—all of which constitute inequitable conduct. Therefore, the first prong of the equitable subordination test regarding inequitable conduct is satisfied.

Second, Hsu's conduct resulted in injury to the creditors and gave Hsu an unfair advantage. As previously discussed, Hsu, as an insider of the Debtor, and ICT, as a majority shareholder of the Debtor, each had an affirmative duty to act in the best interest of the Debtor and its creditors. *Hughes*, 680 S.W.2d at 843. However, the Defendants only acted in the best interest of themselves. By creating AMP Services, and then taking the Debtor's most valuable assets, the Defendants acted to augment their own finances to the detriment of the Debtor and its creditors. Thus, the second prong of equitable subordination is satisfied.

Finally, the invocation of equitable subordination in this suit must be consistent with the provisions of the Bankruptcy Code. This Court concludes that it is. To ensure that an equitable result is reached, bankruptcy courts possess broad statutory power under the Bankruptcy Code: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions

of this title." 11 U.S.C. § 105(a). This Court's invocation of subordination is consistent with this Court's § 105 powers. Moreover, "Bankruptcy Courts are courts of equity," *Nikoloutsos v. Nikloloutsos (In re Nikoloutsos)*, 199 F.3d 233, 236 (5th Cir. 2000), and "a court of equity is enabled to frustrate fraud and work complete justice." *Tex. Co. v. Miller*, 165 F.2d 111, 116 (5th Cir. 1947).

In sum, because all three prongs of the Fifth Circuit's test are met, this Court will not allow the Defendants to benefit from their inequitable conduct at the expense of AMPS's creditors. Therefore, any claims the Defendants may have for monies recovered by the Trustee are subordinate to both the Trustee's claims and any other creditor's claim against the estate.

## J.     Damages

The Court concludes that the Trustee should be awarded damages because, as already discussed above, the Trustee has successfully proven the elements of the following causes of action:  (1) Spoliation of evidence; (2) Breach of fiduciary duty and usurpation of business opportunities; (3) Conversion of estate property; (4) Turnover of property of the estate; (5) Unauthorized post-petition transfers; and (6) Fraudulent transfers.

### 1.     Actual damages should be awarded.

Because the Trustee may avoid the transfers of the Debtor's property under §§ 548 and 549, the Trustee may recover, for the benefit of the estate, the value of the property that has been fraudulently transferred from either the "initial transferee of such transfer, or the entity for whose benefit such transfer was made; or any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a).   As discussed above, the Defendants fraudulently transferred various assets, including intangible business assets. Thus, the estate is entitled, under 11 U.S.C. § 550(a) and section

24.008 of TUFTA, to relief in the amount of the value taken by the Defendants from the Debtor's bankruptcy estate. *See ASARCO*, 404 B.R. at 162 (citing *In re Vedaa*, 49 B.R. 409, 411 (Bankr. D.N.D. 1985) ("The recovery to be allowed is wholly within the discretion of the court. Courts will generally allow the trustee to recover the value of the property where the subject property is itself unrecoverable.")).

At first blush, § 550(a) provides only that a "trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property." 11 U.S.C. § 550(a). However, the scope of the Court's power under § 550(a) extends beyond the express language of the statute. *See ASARCO*, 404 B.R. at 173 (stating that the court can "award the amount of damages necessary to make the debtor's estate/creditors whole and any damages awarded should put the estate back in the financial condition in which it would have been at the time."). Thus, the Court has the authority under § 550(a) to use its discretion to restore the estate to the position it would have been in had the assets never been fraudulently transferred out of the estate.

In this suit, the actual value the Debtor's estate would have earned if it had use of the intangible assets is unknown. This lack of knowledge makes it difficult to determine the actual value the estate lost. However, as noted in *ASARCO*, the Court has the discretion to approximate these damages to make the estate whole. *See ASARCO*, 404 B.R. at 173. Using its discretion, the Court may approximate the value the Debtor's estate lost as a result of the Defendants fraudulently transferring the assets. *See id.* (exercising the court's power to determine the true value that the estate lost as a result of the fraudulent transfer).

On February 20, 2007, Hsu started the business known as AMP Services. [Finding of Fact No.

8.] As discussed above, the Defendants used, and generated income from, AMPS's Assets. They did so by forming AMP Services, and then having that entity use AMPS's Assets to generate income. Under these circumstances, gross profits of AMP Services represents an accurate value that the estate would have generated itself if it had had the use of the assets which the Defendants transferred out of the estate to AMP Services. Additionally, the Trustee, an accountant by profession, testified why he seeks gross profits as a measure of damages. The Trustee explained that if an existing company wanted to purchase the Debtor's business, that purchaser would be asked to pay a price based on gross sales less cost of good sold (i.e. gross profits) rather than net income because the purchaser, as an existing company, would already have its own office and infrastructure in place. [Finding of Fact No. 31.] This Court accepts this reasoning, as it heard no persuasive testimony disputing this approach. Thus, this Court will use the gross profits figure set forth in the tax returns of AMP Services for 2007 and 2008—but only as a starting point to calculate actual damages. Despite the Trustee's point about an existing company already having its own office and an infrastructure in place, this Court nevertheless believes that it should still deduct certain expenses reported in the tax returns by AMP Services that the business incurred in 2007 and 2008.

AMP Services reported gross profit of $134,056.00 and $214,943.00 in 2007 and 2008, respectively. [Finding of Fact Nos. 22 & 23.] Thus, the Court must determine what expenses to deduct.

After reviewing the expenses that AMP Services incurred as reported in its tax returns, the Court is leery about deducting the full amount reported for miscellaneous expenses.[9] The Court

---

[9] In the tax returns, there is no category entitled "miscellaneous expenses." Rather, the category is described as "Other deductions." For purposes of this Opinion, these two descriptions are interchangeable.

recognizes that all businesses require *some* miscellaneous expenses in order to operate. However, this Court does not understand the nature and amount of the miscellaneous expenses that AMP Services reported. Accordingly, this Court will exercise its discretion to make the estate whole and deduct only 50% of the reported miscellaneous expenses that AMP Services reported on its 2007 and 2008 tax returns. Additionally, the Court will not deduct any of the amounts listed as "Compensation of officers" on the 2007 and 2008 tax returns. To deduct such compensation would result in a *de minimus* damage figure, and this Court will not reward wrongdoers—i.e. the Defendants—who usurp corporate opportunities of the Debtor and pay themselves handsomely while simultaneously attempting to have their newly formed, 100% owned entity (i.e. AMP Services) escape tax liability.[10] The Court accepts the other expense figures that AMP Services reported in its tax returns for purposes of calculating actual damages in this suit.

Thus, the actual damages are calculated as follows:

|  | **2008** | **2007** |
|---|---|---|
| Gross Profit | $214,943.00 | $134,056.00 |
| Salary & Wages | ($30,249.00) | ($32,803.00) |
| Repairs & Maintenance | ($1,130.00) | ($338.00) |
| Rents | ($13,316.00) | ($6,700.00) |
| Taxes & Licenses | ($22,612.00) | ($9,232.00) |
| Interest | ($142.00) | $0.00 |
| Depreciation | ($72.00) | $0.00 |
| 50% of Miscellaneous Exp. | ($31,480.00) | ($16,777.00) |
| **Amount of Damages** | **$115,942.00** | **$68,206.00** |

Therefore, the Defendants, who are jointly and severally liable in this suit, shall pay the Trustee actual damages of $68,206.00 for 2007 and $115,942.00 for 2008, for a total amount of $184,148.00.

---

[10]AMP Services' 2007 and 2008 tax returns deduct $66,346.00 and $115,321.00, respectively, as officer compensation, which results in reported taxable losses (as opposed to income) of -$14,917.00 and -$30,858.00, respectively. Stated differently, AMP Services reported a net loss for 2007 and 2008, thereby avoiding any tax liability.

2.    **Assessment of attorney's fees is not warranted.**

The Plaintiff has cited no authority under the either the Bankruptcy Code or Texas law in support of its request that the Defendants should reimburse the Plaintiff for the attorney's fees which he has incurred in prosecuting the Amended Complaint.  Texas law requires that a court enter judgment for attorneys' fees only where there is a contract or statute that provides for such remedy. *See Sec. Investor Prot. Corp. et al. v. Cheshier & Fuller, L.L.P. (In re Sunpoint Sec., Inc.)*, 377 B.R. 513, 572 (Bankr. E.D. Tex. 2007); *see also Promedco of Sw. Fla., Inc. v. Humphrey (In re Promedco of Las Cruces, Inc.)*, No. 02-4075, 2003 WL 21962443, at *17 (N.D. Tex. Aug. 12, 2003) (denying attorney's fees to plaintiffs for lack of authority under the Bankruptcy Code).  Here, there is none.  For these reasons, the Court denies the Plaintiff's request for attorneys' fees.

3.    **This Court will award exemplary damages.**

In addition to the actual damages awarded, the Court concludes that the facts of this suit warrant awarding exemplary damages.  There is no specific provision in the Bankruptcy Code that allows this Court to grant exemplary damages. *Smith v. Lounsbury (In re Amberjack Interests, Inc.)*, 326 B.R. 379, 392 (Bankr. S.D. Tex. 2005).  "A bankruptcy court may rely on state law to award exemplary damages where the Bankruptcy Code does not specifically allow such measures." *Franklin Bank, S.S.B. v. Barnes (In re Barnes)*, 369 B.R. 298, 310 (Bankr. W.D. Tex. 2007); *In re Amberjack Interests, Inc.*, 326 B.R. at 391 ("A bankruptcy court may rely on state law to award exemplary damages when the Code does not specifically allow such measures.").  Under Texas law, courts of equity have the authority to assess exemplary damages. *Id.* (citing *In re Performance Nutrition, Inc.*, 239 B.R. 93, 115 (Bankr. N.D. Tex. 1999)).  Indeed, bankruptcy courts are courts of equity,

*Nikoloutsos v. Nikoloutsos (In re Nikoloutsos)*, 199 F.3d 233, 236 (5th Cir. 2000), and therefore, this Court may properly award exemplary damages. *See In re Barnes*, 369 B.R. at 310 (stating that bankruptcy courts may award exemplary damages).

The plaintiff must have suffered actual loss or injury to receive an award of exemplary damages. *Mack v. Newton*, 737 F.2d 1343, 1367 (5th Cir. 1984). Exemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the claimant's harm results from: (1) fraud; (2) malice; or (3) gross negligence. *See In re Barnes*, 369 B.R. at 310 (citing Tex. Civ. Prac. & Rem. Code § 41.003). The Texas Civil Practice and Remedies Code provides guidance on each of these three terms: Fraud means "fraud other than constructive fraud." Tex. Civ. Prac. & Rem. Code § 41.001(6); gross negligence is defined as an act or omission:

> (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
> (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code § 41.001(11); and malice is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." Tex. Civ. Prac. & Rem. Code § 41.001(7). Specific intent means that "the actor desires to cause the consequences of his act, or that he believes the consequences are substantially certain to result from it." *Mission Res., Inc. v. Garza Energy Trust*, 166 S.W.3d 301, 313 (Tex. App.—Corpus Christi 2005, pet. filed).

Based upon the testimony given at trial and the exhibits introduced at trial, this Court concludes that the Plaintiff has proven, by clear and convincing evidence, that the Debtor's estate was harmed by the Defendants' acts of fraud, malice, and gross negligence based upon the following causes of

49

action:   (a) Spoliation of evidence; (b) Breach of fiduciary duty and usurpation of business opportunities; (c) Conversion of estate property; (d)  Turnover of property of the estate; (e) Unauthorized post-petition transfers; and (f) Fraudulent transfers.  Thus, the Plaintiff is entitled to exemplary damages.

      **a.**      **Spoliation of Evidence**

The Court has already concluded that the Defendants intentionally destroyed financial documents of the Debtor, thereby acting in bad faith and breaching their duty to preserve evidence. *See supra* Part IV.C. Hsu himself testified that he had the cleaning crew destroy financial documents of the Debtor. [Finding of Fact No. 19.] The record therefore supports that the Defendants' spoliation of evidence (i.e. ordering the cleaning crew to dispose of the documents) is an act of gross negligence, fraud, and malice.  Moreover, this Court concludes that the Trustee has proven, by clear and convincing evidence, that the destruction of the financial documents has harmed the Debtor's estate. Specifically, the Trustee testified that the destruction of documents has prevented the Trustee from being able: (1) to verify all of the financial records of the Debtor; and (2) to ascertain the Debtor's complete financial condition as of the Petition Date, particularly in regards to the services portion of the Debtor's business. [Finding of Fact No. 29.]  In short, while there is no doubt that the services portion of the Debtor's business had value as of the Petition Date, the Trustee's inability to review all documents relating to the Debtor's operations has inhibited him from determining an exact value or, at least, a range of values.

      **b.**      **Breach of Fiduciary Duty and Usurpation of Business Opportunities**

As noted earlier in this Opinion, the Defendants have breached the fiduciary duty they owed

to AMPS. *See supra* Part IV.D.2.    Bankruptcy courts in Texas may award exemplary damages against corporate officers who breach their fiduciary duties to debtor corporations in Chapter 7. *See In re Performance Nutrition, Inc.*, 239 B.R. at 116; *see also In re Brentwood Lexford Partners, LLC*, 292 B.R. at 275 (holding exemplary damages would be justified had the trustee recovered for breach of fiduciary duty).  Given the facts in this suit, the Defendants' breach of fiduciary duty constitutes acts of fraud, malice, and gross negligence.  Moreover, based upon the testimony adduced and the exhibits introduced at trial, this Court finds that the Plaintiff proved, by clear and convincing evidence, that the Debtor's estate was harmed by the Defendants' conduct, including their breaches of fiduciary duty. In *Amberjack*, the principals of the debtor corporation in a Chapter 7 case misappropriated corporate funds, thereby breaching their fiduciary duty. *In re Amberjack Interests*, 326 B.R. at 393.  As this Court explained in *Amberjack*, an indifference to fiduciary duties constitutes, "an extreme degree of risk, considering the probability and magnitude of the potential harm to others." *In re Amberjack Interests*, 326 B.R. at 393.  This "extreme degree of risk" falls directly within the gross negligence definition under Section 41.001 of the Texas Civil Practice and Remedies Code.  Accordingly, here, the Court may properly assess exemplary damages against the Defendants for their breach of fiduciary duties.

c.    **Conversion of Estate Property**

This Court has already concluded that the Defendants are liable for conversion of property of the Debtor's estate.  *See supra* Part IV.E.  The Defendants' use of AMPS Assets to generate income for AMP Services made it impossible for the Trustee to liquidate AMPS's Assets for the benefit of the Debtor's estate.  Additionally, by using AMPS Assets, the Defendants confused the Debtor's

customers and suppliers and acted with the intent to defraud the Debtor and its estate of its service business. For all these reasons, the Defendants' acts of conversion constitute acts of fraud, malice, and gross negligence. Further, the Court concludes that the Trustee has proven, by clear and convincing evidence, that these acts have harmed the Debtor's estate. Indeed, but for these acts, the estate would not have lost assets of value which the Trustee could have liquidated so that the allowed claims in this Chapter 7 estate could be paid in part, if not in full.

### d.   Turnover of Property of the Estate

The Defendants' liability for the cause of action of turnover of property of the estate constitutes fraud and malice for the same reasons stated immediately above regarding conversion of estate property. Further, the Court concludes that the Trustee has proven, by clear and convincing evidence, that the Defendants' failure to turnover property of the Debtor's estate has harmed the Debtor's estate. By way of one example only, the checks that AMP Services received   [Finding of Fact No. 18]—checks to which the Debtor, not AMP Services, were entitled—should have been turned over to the Trustee but were not; if this is not damage to the estate, then nothing is.

### e.   Unauthorized Post-petition Transfers

The Defendants' unauthorized post-petition transfers were intentional and defrauded the Debtor and its creditors. The Defendants transferred AMPS Assets post-petition without authority from the Court, the Code, or the Trustee. By doing so, the Defendants committed acts of fraud, malice, and gross negligence. Further, the Court concludes that the Trustee has proven, by clear and convincing evidence, that these acts have harmed the Debtor's estate. Indeed, but for these acts, the estate would not have lost assets of value which the Trustee could have liquidated so that the allowed claims in this

Chapter 7 estate could be paid in part, if not in full.

### f.    Fraudulent Transfers

In accordance with the § 548(a)(1)(A) and TUFTA analysis, the Defendants' conduct constitutes acts of fraud and malice. *See supra* Part IV.H. The Defendants acted with actual intent to hinder, delay, and defraud the Debtor. Specifically, because the Defendants fraudulently transferred AMPS Assets and deprived the Debtor of its only viable business sector (AMPS service business), a finding of fraud and malice is appropriate. Further, the Court concludes that the Trustee has proven, by clear and convincing evidence, that these acts have harmed the Debtor's estate. Indeed, but for these acts, upon the Petition Date, the Debtor's estate would still have had the assets which had in fact been transferred prior to the Petition Date; and the Trustee could then have liquidated these assets so that the allowed claims in this Chapter 7 estate could be paid in part, if not in full.

In *Amberjack Interests*, the principal owners of the debtor misappropriated cash from the debtor and funneled the proceeds into another corporation. *In re Amberjack Interests*, 326 B.R. at 393. Here, as discussed above, the Defendants used AMPS's Assets to generate income for the newly formed entity, AMP Services, and to usurp business opportunities from the Debtor. In *Amberjack*, this Court ultimately granted the Plaintiff exemplary damages. 326 B.R. at 394. This Court concludes that the Defendants' actions in this suit are equally as deplorable as the defendants' actions in *Amberjack*. Accordingly, this Court will award exemplary damages in this suit as well.

### g.    Assessment of exemplary damages

Texas law provides that an award for exemplary damages is justified only upon proving fraud, malice, or gross negligence by clear and convincing evidence. Tex. Civ. Prac. & Rem. Code Ann. §

41.003.  "Because fraud is often difficult to prove, courts justify awarding exemplary damages upon a showing of malice." *In re Amberjack Interests*, 326 B.R. at 392 (citing *Roth v. Mims*, 298 B.R. 272, 297 (N.D. Tex. 2003)).  The clear and convincing standard has been described as falling between the "preponderance of the evidence" standard used in civil proceedings and the "beyond a reasonable doubt" standard used in criminal proceedings. *In re Amberjack Interests*, 326 B.R. at 392 (citing *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)).

Under Texas law, exemplary damages are capped at the greater of: "(1)(A) two times the amount of economic damages; plus (B) an amount equal to any noneconomic damages found by the jury, not to exceed $750,000.00; or (2) $200,000.00." Tex. Civ. Prac. & Rem. Code Ann. § 41.008. "The amount awarded must be reasonably proportional to actual damages, though no set ratio exists for measuring reasonableness." *In re Amberjack Interests*, 326 B.R. at 393 (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)).  The Court weighs the following six factors in determining the reasonableness of an award:

(1) the nature of the wrong;
(2) the character of the conduct involved;
(3) the degree of culpability of the wrongdoer;
(4) the situation and sensibilities of the parties concerned;
(5) the extent to which such conduct offends a public sense of justice and propriety; and
(6) the net worth of the defendant.

Tex. Civ. Prac. & Rem. Code Ann. § 41.011(a); *In re Amberjack Interests*, 326 B.R. at 393 (citing *Alamo Nat'l Bank*, 616 S.W.2d at 910).  Exemplary damages awarded by the Court are "presumptively reasonable" if the award is within the statutory limits. *In re Amberjack Interests*, 326 B.R. at 393 (citing *Peco Constr. Co. v. Guajardo*, 919 S.W.2d 736, 742 (Tex. App.—San Antonio 1996, writ

denied)).

Under Section 41.008 of the Texas Civil Practice and Remedies Code, this Court may assess a maximum of $368,296.00 in exemplary damages against the Defendants. Tex. Civ. Prac. & Rem. Code Ann. § 41.008. This figure represents a doubling of the actual damages (i.e. $184,148.00 multiplied by 2 equals $368,296.00). Thus, this Court's award of exemplary damages is within the statutory limits and is therefore reasonable under Texas law.

Moreover, this award satisfies the test of constitutionality as it does not violate the Defendants' substantive due process rights. *See BMW of N. Am., Inc.*, 517 U.S. 559, 574-75 (1996); *see also Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998); *Citizens Nat'l Bank v. Allen Rae Investments, Inc.*, 142 S.W.3d 459, 485 (Tex. App.—Fort Worth 2004, no writ). In *BMW*, the United States Supreme Court identified three "guideposts" for determining whether or not exemplary damage awards are "grossly excessive:" (1) the degree of reprehensibility of the defendant's conduct, (2) the comparison between actual and exemplary damages; and (3) the relation between the amount awarded and the amount authorized under similar circumstances. *BMW*, 517 U.S. at 575; *see also Citizens*, 142 S.W.3d at 485-86. First, as this Court has already noted, the record reflects that the Defendants' conduct was reprehensible. The Defendants' level of misconduct supports the award. Second, there is little disparity between the exemplary damages award of $368,296.00 and the $184,148.00 in actual damages. The ratio of exemplary damages to actual damages is two to one. "Although the precise award in any case must be based upon its particular facts and circumstances, the U.S. Supreme Court has noted that we have 'a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and

punish.'" *Citizens*, 142 S.W.3d at 486 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S.

408, 425 (2003)). Finally, under the third guidepost, the amount awarded is less than what this Court

could have awarded. *See ASARCO*, 404 B.R. at 162 (citing *In re Vedaa*, 49 B.R. at 411 ("The recovery

to be allowed is wholly within the discretion of the court.")). The Court, in its discretion, could have

awarded higher actual damages by using gross sales or gross profits, rather than gross profits less

various expenses. As noted in *ASARCO*, the Court has the discretion to approximate these damages

to make the estate whole. *See ASARCO*, 404 B.R. at 173. This higher award would have caused the

exemplary damages to be much greater than what this Court has chosen to award.

Therefore, for all the reasons set forth above, the Court concludes that the exemplary damage

award does not violate statutory, constitutional, or common law constraints.

**4.      Prejudgment and Post-judgment interest should be awarded.**

**a.      Interest Under Federal Law**

Federal law authorizes this Court to award prejudgment interest. According to Fifth Circuit

precedent, such interest may be awarded in cases involving fraudulent transfers because "it furthers the

congressional policies of the Bankruptcy Code" and "compensates the estate for the time it was without

use of the transferred funds." *In re Tex. Gen. Petroleum Corp.*, 52 F.3d 1330, 1339-40 (5th Cir. 1995).

Additionally, this Court has the discretion to impose post-judgment interest. *See Williams v. Trader*

*Pub. Co.*, 218 F.3d 481, 488 (5th Cir. 2000) (holding that, "[a] district court has discretion to impose

a pre and post-judgment interest award to make a plaintiff whole"); 28 U.S.C. § 1961(a) (allowing

interest on "any money judgment in a civil case recovered in a district court" at the rate of the "weekly

average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal

Reserve System, for the calendar week preceding the date of the judgment").

As a general rule, "[f]ederal law governs the allowance of prejudgment interest when a cause of action arises from a federal statute." *McFarland et al. v. Leyh (In re Tex. Gen. Petrol. Corp.)*, 52 F.3d 1330, 1339 (5th Cir. 1995) (holding that the bankruptcy court did not abuse its discretion by awarding prejudgment interest for a cause of action under 11 U.S.C. § 548). However, this general rule often leads a court back to state law. *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 984 (5th Cir. 1991). State law is an appropriate source of guidance, since there is no federal statute governing prejudgment interest. *Dramse v. Delta Family-Care Disability & Survivorship Plan*, No. 3:05-CV-524-M, 2007 WL 60907, at *2 (N.D. Tex. Jan. 9, 2007), *vacated on other grounds by*, 269 Fed. Appx. 470 (5th Cir. 2008) (citing *Hansen*, 940 F.2d at 984); *see also U.S. for Use and Benefit of Canion v. Randall & Blake*, 817 F.2d 1188, 1193 (5th Cir. 1987) (applying Texas state law for the amount of prejudgment interest because the federal statute at issue was silent on the issue of prejudgment interest). "While there is a generally applicable federal statute governing postjudgment interest, *see* 28 U.S.C. § 1961(a), there is no equivalent statute governing prejudgment interest." *Hansen*, 940 F.2d at 984; *see Anderson v. Mega Lift Sys., L.L.C. et al. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10 (Bankr. E.D. Tex. June 4, 2007).

Under Texas law, "[t]he prejudgment interest rate is equal to the postjudgment interest rate applicable at the time of the judgment." Tex. Fin. Code § 304.103; *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 500 (5th Cir. 2002) (holding that under Texas law, the rate of pre-judgment interest "accrue[s] at the same rate as post-judgment interest."); *see also Bob Anderson v. Mega Lift Sys., L.L.C. (In re Mega Sys., L.L.C.)*, No. 04-6085, 2007 WL 1643182, at *10-11 (Bankr.

E.D. Tex. 2007).  The post-judgment rate is statutorily set at the "prime rate as published by the Board

of Governors of the Federal Reserve System on the date of computation" unless this rate is less than

five percent or more than fifteen percent.  Tex. Fin. Code Ann. § 304.003(c).  Therefore, this Court will

follow the Texas method of calculating interest and use the prime rate, as opposed to the Treasury yield.

    **b.**    **Interest Under Texas Law**

    Under Texas law, prejudgment interest may be awarded if either the "general principles of

equity" or an "enabling statute" allow such an award.  *Johnson & Higgins of Tex., Inc. v. Kenneco

Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998) (citing *Cavnar v. Quality Control Parking, Inc.*, 696

S.W.2d 549, 552 (Tex. 1985); and *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480,

483-85 (Tex. 1978)).  Texas courts have held that "the decision to award prejudgment interest is left

to the sound discretion of the trial court, which should rely upon equitable principles and public policy

in making this decision." *Citizens Nat. Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487 (Tex.

App.—Fort Worth 2004, no pet.).  With respect to awarding prejudgement interest in fraudulent transfer

cases, Texas courts have concluded that equity allows for such an award, and thus have frequently

awarded pre-judgment interest in those cases.  *See, e.g., Lentino v. Cullen Center Bank & Trust*, No.

14-00-00692-CV, 2002 WL 220421, at *1 (Tex. App.—Houston [14th Dist.] Feb. 14, 2003, pet.

denied) (mem. op.); *McDill Columbus Corp. v. Univ. Woods Apartments, Inc.*, No. 06-99-00138-CV,

2001 WL 392061, at *3 (Tex. App.—Texarkana Apr. 19, 2001, pet. denied) (unpublished); *Arlitt v.

Weston*, No. 04-98-00035-CV, 1999 WL 1097101, at *2 (Tex. App.—San Antonio Dec. 1, 1999, pet.

denied).  Additionally, post-judgment interest may also be awarded on a fraudulent transfer claim under

Texas law.  *Fidelity & Deposit Co. of Maryland v. Tri-Lam Co., Inc.*, No. SA-06-CA-207-XR, 2007

58

WL 1452632, at *5 (W.D. Tex. May 15, 2007) (citing Tex. Fin. Code Ann. § 304.001).

As already noted, the rate for both prejudgment and post-judgment interest under Texas law is the prime rate as published by the Board of Governors of the Federal Reserve System. Tex. Fin. Code Ann. § 304.003(c). However, § 304.003(c)(2) of the Texas Finance Code Annotated states that the judgment rate shall be set at 5% if the current prime rate is less than 5%. The current prime rate is 3.25%. Federal Reserve Statistical Release, H.15 Selected Interest Rates, http://www.federalreserve.gov/releases/h15/current/h15.htm (last visited August 31, 2009). Therefore, pursuant to § 304.003(c)(2) of the Texas Finance Code, the Court will apply a 5% interest rate to both prejudgment and post-judgment awards. *See Int'l Turbine Servs., Inc.*, 278 F.3d at 500 (holding that the rate of pre-judgment interest accrues at the same rate as post-judgment interest); *see also In re Mega Sys., L.L.C.*, No. 04-6085, 2007 WL 1643182, at *10-11 (holding same).

In this suit, the Debtor's petition was filed on July 10, 2007, [Finding of Fact No. 8]; therefore, prejudgment interest should be awarded for just over two years (i.e. from July 10, 2007 to August 31, 2009). The Court, exercising its discretion pursuant to *Citizens National Bank*, concludes that it should award prejudgment interest only on the amount of actual damages, not on exemplary damages. 142 S.W.3d at 487. Therefore, the prejudgment interest in this suit totals $19,701.31, which is derived as follows:

|  | **2007** | **2008** |
|---|---|---|
| Principal | $68,206.00 | $115,942.00 |
| Rate | 5.0% | 5.0% |
| Term | 2.1452 years[11] | 2.1452 years |
| Interest | $7,315.79[12] | $12,435.97[13] |
|  | **Total Prejudgment Interest** (2007+2008) | **$19,751.76** |

The total damages, comprising actual damages, prejudgment interest on actual damages, and exemplary damages, is $572,195.76, which is computed as follows: Total actual damages of $184,148.00, plus total prejudgment interest of $19,751.76, plus exemplary damages of $368,296.00, equals a total judgment to be entered in the amount of $572,195.76.

Moreover, with respect to post-judgment interest, Section 304.005 of the Texas Finance Code provides:

(a) Except as provided by Subsection (b), postjudgment interest on a money judgment of a court in this state accrues during the period beginning on the date the judgment is rendered and ending on the date the judgment is satisfied.

(b) If a case is appealed and a motion for extension of time to file a brief is granted for a party who was a claimant at trial, interest does not accrue for the period of extension.

Tex. Fin. Code Ann. § 304.005. Accordingly, post-judgment interest of 5% per annum will begin accruing on the amount of $572,195.76 from the date the judgment is entered until the date the judgment is satisfied in full.

---

[11] The actual number of years is 783 days divided by 365 days—i.e. the number of days since the petition date until the judgment date (783 days) divided by the number of days in a year. Thus, this figure of approximately 2.1452 years is the term this Court will use for both the 2007 and 2008 calculations.

[12] This number is calculated by multiplying $68,206.00 by .05, then multiplying that amount by 783 days divided by 365 days—i.e. ($68,206.00 x .05) x (783/365) = $7,315.79.

[13] This number is calculated by multiplying $115,942.00 by .05, then multiplying that amount by 783 days divided by 365 days—i.e. ($115,942.00 x .05) x (783/365) = $12,435.97.

## V. CONCLUSION

For all of the reasons set forth herein, the Court concludes that the Plaintiff has met all the elements of each alleged cause of action.  Therefore, the Court finds for the Plaintiff and awards the Plaintiff damages in the amount of $572,195.76.  A judgment consistent with this Opinion will be entered on the docket simultaneously with the entry of this Opinion.


Signed on this 31st day of August, 2009.

Jeff Bohm
United States Bankruptcy Judge